**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-50016 |
| *Plaintiff-Appellant*, | D.C. No. 2:20-cr-00516-FMO-1 |
| v. | |
| NATHAN WILSON; CHRISTOPHER BEASLEY, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted May 6, 2024
Pasadena, California

Filed December 19, 2024

Before: Danielle J. Forrest and Patrick J. Bumatay, Circuit
Judges, and James Donato,* District Judge.

Opinion by Judge Forrest;
Concurrence by Judge Bumatay;
Concurrence by Judge Donato

---

* The Honorable James Donato, United States District Judge for the
Northern District of California, sitting by designation.

## SUMMARY[**]

### Criminal Law

In a case in which the government alleges that Nathan
Wilson and Christoher Beasley (Defendants) set fire to a
police car during a protest following the killing of George
Floyd, the panel reversed the district court's selective-
prosecution discovery order, reversed the district court's
order dismissing without prejudice an indictment charging
Defendants with arson, and remanded for further
proceedings.

Defendants moved to dismiss their indictment, arguing
that they were unconstitutionally singled out for prosecution
based on the perception that they held anti-government
views. Alternatively, Defendants sought discovery on their
selective-prosecution claim. The district court denied
Defendants' motion for dismissal but granted them
discovery regarding selective prosecution. But after the
Government indicated that it would seek appellate review
rather than produce the ordered discovery, the district court
dismissed the indictment without prejudice.

Rejecting Defendants' argument that this court lacks
jurisdiction, the panel explained that nothing in the text of
18 U.S.C. § 3731 (governing Government appeals in
criminal cases) indicates that appellate jurisdiction exists
only for *final* decisions or orders.

---

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

A defendant seeking discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent.

Analyzing statistics in connection with its selected control group of arsonists in the Central District of California, the district court found that the U.S. Attorney's Office was "obviously aware of and chose not to federally prosecute far more serious and damaging arsons" than the police-car burning for which Defendants were charged. As a result, the district court concluded that Defendants met their burden to show evidence of discriminatory effect.

The panel held that this was an abuse of discretion because the district court based its ruling on an erroneous view of the law. To show discriminatory effect sufficient to warrant discovery, a defendant must produce some evidence that similarly situated defendants could have been prosecuted, but were not. To be similarly situated means more than merely committing the same crime in the same place; a proper comparator must be the same as the defendant in all relevant respects. Here, Defendants did not offer evidence, and the district court did not make any findings, about the nature of the proposed comparators other than that they committed a shared crime in a shared location. Because Defendants failed to meet their burden to produce some evidence that similarly situated individuals could have been prosecuted but were not, the panel reversed the district court's selective-prosecution discovery order and its dismissal of the indictment without prejudice, and remanded for further proceedings. The panel declined to address whether Defendants presented evidence of discriminatory intent.

Concurring, Judge Bumatay joined the majority opinion showing that the district court botched the discriminatory-effect analysis, but wrote to explain that the district court's discriminatory-purpose analysis was also flawed. He explained that (1) the government does not engage in arbitrary classifications when it singles out political violence for prosecution; (2) the First Amendment doesn't alter the government's discretionary authority to target political violence; and (3) Defendants offered no evidence that the government prosecuted them for protected non-violent expression.

Concurring, District Judge Donato wrote separately to state his understanding of the standard a defendant must meet to be entitled to discovery on a selective-prosecution claim. Noting that the Supreme Court has not equated the evidentiary burden for discovery with that of establishing a prima facie case of selective prosecution, he wrote that a court must take care to ensure that the threshold a defendant must cross for obtaining discovery is not so high as to foreclose a plausible selective-prosecution claim before the merits are even examined. Judge Donato saw no reason why Defendants, on remand, may not seek to renew a selective-discovery request and claim with proper evidence. He wrote that in the circumstances of this case, the district court could reasonably request a word of explanation from the prosecutors.

**COUNSEL**

Alexander P. Robbins (argued), Assistant United States
Attorney, Deputy Chief, Criminal Appeals Section; David
R. Friedman, Jeremiah Levine, and Sara B. Vargas,
Assistant United States Attorneys; Bram M. Alden,
Assistant United States Attorney, Chief, Criminal Appeals
Section; E. Martin Estrada, United States Attorney; United
States Department of Justice, Office of the United States
Attorney, Los Angeles, California; for Plaintiff-Appellant.

Andrew B. Talai (argued), Deputy Federal Public Defender;
Cuauhtemoc Ortega, Federal Public Defender, Central
District of California; Federal Public Defender's Office, Los
Angeles, California; Mark M. Kassabian, Buehler &
Kassabian, Pasadena, California; for Defendants-Appellees.

---

**OPINION**

FORREST, Circuit Judge:

In summer 2020, nationwide protests followed the death
of George Floyd. In some cities, the protests escalated into
rioting and property destruction. Public officials—including
then-President Donald Trump and Attorney General
William Barr—promised to prosecute the rioters responsible
for the violence and destruction.

On May 31, 2020, Defendants-Appellees Nathan Wilson
and Christopher Beasley allegedly joined a protest in Santa
Monica, California and set fire to a police car. They were
both federally indicted on one count of arson. Defendants
moved to dismiss their indictment, arguing that they were

unconstitutionally singled out for prosecution based on the
perception that they held anti-government views.
Alternatively, Defendants sought discovery on their
selective-prosecution claim. The district court denied
Defendants' motion for dismissal but granted them
discovery regarding selective prosecution. But after the
Government indicated that it would seek appellate review
rather than produce the ordered discovery, the district court
dismissed the indictment without prejudice. On appeal, the
Government contends that the district court erred in ordering
selective-prosecution discovery, and Defendants contend
that we lack appellate jurisdiction. We conclude that we have
jurisdiction, and we reverse and remand.

## I. BACKGROUND

### A. George Floyd Protests

After George Floyd was killed at the hands of
Minneapolis police officers on May 25, 2020, protests
sprang up across the nation, sometimes turning into
destructive riots. The week after Floyd's death, Attorney
General Barr issued a statement that the "peaceful and
legitimate protests h[ad] been hijacked by violent radical
elements. Groups of outside radicals and agitators are
exploiting the situation to pursue their own separate, violent,
and extremist agenda." He explained that the violence
associated with the rioting was "domestic terrorism" and
"[f]ederal law enforcement actions will be directed at
apprehending and charging the violent radical agitators who
have hijacked peaceful protest and are engaged in violations
of federal law." President Trump echoed similar sentiments:
"[O]ur nation has been gripped by professional anarchists,
violent mobs, arsonists, looters, criminals, rioters, antifa, and
others. . . . I want the organizers of this terror to be on notice

that you will face severe criminal penalties and lengthy
sentences in jail." In a conference call with state governors,
President Trump and Attorney General Barr reiterated that
some subset of "extremist anarchist agitators," "terrorists,"
and "Antifa" were responsible for the property destruction
and would be the target of federal enforcement.

A month after Floyd's death, on June 26, 2020, Attorney
General Barr issued a memorandum stating that he was
"directing the creation of a task force devoted to countering
violent anti-government extremists'" The memorandum
explained that there had been "significant threats to the rule
of law" from "anti-government extremists engaged in
indefensible acts of violence designed to undermine public
order," such as "violently attack[ing] police officers and
other government officials, destroy[ing] public and private
property, and threaten[ing] innocent people." And months
later, in September 2020, Attorney General Barr directed
United States Attorneys to "be aggressive when charging
violent demonstrators with crimes" and "encouraged the
prosecutors to seek a number [of] federal charges . . . even
when state charges could apply[.]"

## B. Defendants' Prosecutions

Wilson and Beasley allegedly participated in a protest in
Santa Monica, California on May 31, 2020, and set fire to a
police car. A three-minute video shows two men damaging
and graffitiing the police car before starting a fire with a
lighter. In the video, the men take pictures with and climb
onto the smoking car. The day after the protest, Beasley
posted a video on Twitter in which he said that the "solution
to cops killing Black people is to kill cops." The Twitter
video caught the Federal Bureau of Investigation's (FBI)
attention. Further investigation of Beasley's social media

revealed that on the day of the protest he posted a video of the police-car arson on Facebook. Additional investigation revealed that Beasley was a long-time member of the Westside Crips gang and had been convicted of multiple violent crimes.

Initially law enforcement did not identify Wilson as the second person in the arson video. But in September 2020, Wilson's girlfriend called 9-1-1 to report that he had set fire to her car after a domestic dispute. She claimed that he had also burned a police car earlier that year in Santa Monica.

Defendants were indicted on a single count of arson of a vehicle belonging to an institution or organization receiving federal financial assistance, in violation of 18 U.S.C. § 844(f)(1), (2), 2(a). A year later, Defendants moved to dismiss their indictment for selective prosecution. In sum, Defendants relied on statistical evidence that the Central District of California's U.S. Attorney's Office very rarely prosecuted arson. Citing statements from President Trump and Attorney General Barr, Defendants argued that the "decision to prosecute [them] for federal arson is the result of an unconstitutional policy targeting persons the government believed to be anti-government protesters." Alternatively, they requested discovery regarding their allegation of selective prosecution. The Government opposed Defendants' motion.

The district court denied Defendants' motion to dismiss their indictment without prejudice but granted their alternative discovery requests in full, subject to objections based on the deliberative-process privilege. The Government moved for reconsideration, explaining that if the district court denied reconsideration, "the U.S. Attorney's Office intends to seek appellate review . . . rather

than produce the discovery covered by the Court's order."
Thus, the Government asked the district court to dismiss the
indictments pending its appeal to this court. Defendants
opposed the motion for reconsideration, arguing that the
Government's requested relief was "a transparent attempt to
enlist the Court in the government's effort to subvert the
rules, and to recast an unappealable discovery order as an
appealable order dismissing the indictment." The district
court determined that the appropriate remedy for failure to
comply with the court's discovery order was to set a hearing
for the Government to "show cause as to why it should not
be held in contempt."

The district court declined to reconsider its prior ruling
but elected to dismiss the indictment without prejudice rather
than "hold[] the government in contempt in order to provide
it with the basis for an appealable order." Noting the
Government's intention to seek appellate review rather than
produce the ordered discovery, the district court dismissed
the indictment. The Government appealed the district court's
discovery order, its order dismissing the indictment, and the
judgment.

## II. DISCUSSION

### A. Jurisdiction

The first issue that we must resolve is whether we have
jurisdiction. We review our appellate jurisdiction de novo.
*United States ex rel. Alexander Volkhoff, LLC v. Janssen
Pharmaceutica N.V.*, 945 F.3d 1237, 1241 (9th Cir. 2020).

In criminal cases, we have jurisdiction over Government
appeals from three types of decisions: (1) an order
"dismissing an indictment or information or granting a new
trial after verdict or judgment" unless double jeopardy has

attached; (2) an order "suppressing or excluding evidence or requiring the return of seized property" made before jeopardy has attached or a verdict rendered; and (3) orders "granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release." 18 U.S.C. § 3731. Congress instructs us to "liberally construe[]" these provisions. *Id*.

Although this case seems to fall into the first category because the Government appeals the district court's order dismissing Defendants' indictment without prejudice, Defendants argue that we lack jurisdiction. Defendants assert that § 3731 cabins the statutory authorization to appeal to only final judgments and that the Government manufactured "review of an otherwise non-appealable [discovery] order that is not specifically listed in § 3731" in a way that raises "serious constitutional and prudential problems."

We disagree for the reasons explained by the Seventh Circuit in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc). That case had nearly identical facts to this one: the district court dismissed an indictment "without prejudice to a new indictment" in order "to permit appellate review of [its selective-prosecution] discovery order, with which the prosecutor had declined to comply." *Id.* at 714. Rejecting the same finality argument that Defendants raise here, the Seventh Circuit noted that "[t]he word 'final' does not appear in § 3731, nor does any similar word." *Id.* at 716. It also explained that orders § 3731 specifically makes appealable—such as dismissals of less than all counts, orders setting a new trial, suppression orders, and orders related to bail and conditions of pretrial release—are not final. *Id.* at 716–17. Thus, the Seventh Circuit concluded that it is "apt

to say that all of § 3731 is an exception to the final-decision rule." *Id.* at 717; *see also United States v. Richter*, 488 F.2d 170, 172 (9th Cir. 1973). And it noted that the Supreme Court has instructed that if a district court enters an order listed in § 3731, "there are no *further* barriers to appeal." *Davis*, 793 F.3d at 718 (discussing *United States v. Wilson*, 420 U.S. 332 (1975)). Finally, the Seventh Circuit rejected the notion that the government can improperly manufacture review of a discovery order because to get review of such an order "requires the [district] court's approval." *Id.* (citing Fed. R. Crim. P. 48(a)). If a district court deems interlocutory review improper, it "has only to avoid issuing one of the sorts of orders that fall within the scope of § 3731." *Id.*

We adopt this same reasoning. Nothing in the text of § 3731 indicates that appellate jurisdiction exists only for *final* decisions or orders. This contrasts with the statute governing appellate jurisdiction in civil cases, which does limit our jurisdiction to appeals "from all final decisions of the district courts." 28 U.S.C. § 1291. And as the Seventh Circuit recounted, the plain language of § 3731 makes multiple non-final decisions appealable. Thus, § 3731 is "a statutory exception to the final judgment rule." *Flanagan v. United States*, 465 U.S. 259, 265 n.3 (1984). And as a prudential matter, it makes sense that Congress authorized some interlocutory appeals by the government "because the Double Jeopardy Clause of the Fifth Amendment creates special obstacles for a prosecutor who contends that a district court's order is erroneous." *Davis*, 793 F.3d at 717.

This is not a close call; we have jurisdiction over this appeal.

## B. Selective-Prosecution Discovery

"Whether the district court applied the correct discovery standard is a legal question that we review de novo." *United States v. Sellers*, 906 F.3d 848, 851 (9th Cir. 2018). We review for an abuse of discretion a district court's determination that the defendant has made the requisite showing to obtain discovery on a claim of unconstitutional selective prosecution. *Id.* at 851–52. "The court necessarily abuses its discretion when it applies the wrong legal standard." *Id.* at 852; *see also Highmark Inc. v. Allcare Health Mgmt. Sys*., 572 U.S. 559, 563 n.2 (2014) ("'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . .'" (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

The Executive Branch has "'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citations omitted). Thus, a "'presumption of regularity supports' . . . prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'" *Id.* (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926)). Selective-prosecution claims—assertions that a prosecutor has brought charges for reasons forbidden by the Due Process Clause of the Fifth Amendment—require courts "to exercise judicial power over a 'special province' of the Executive." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)); *see also United States v. Rundo*, 108 F.4th 792, 798 (9th Cir. 2024) ("[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the

exercise of protected statutory and constitutional rights.'"
(citation omitted)).

Given the separation-of-powers concerns at play, the
standard for proving selective prosecution is "a demanding
one." *Armstrong*, 517 U.S. at 463; *see also id.* at 465; *cf.*
*United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972)
("Mere selectivity in prosecution creates no constitutional
problem."). The Supreme Court has established a two-factor
standard: the defendant must demonstrate "clear evidence,"
first that the decision to prosecute "had a discriminatory
effect and[, second,] that it was motivated by a
discriminatory purpose." *Armstrong*, 517 U.S. at 465
(citation omitted). "[T]he showing necessary to obtain
discovery" on a selective-prosecution claim is
"correspondingly rigorous," *id.* at 468, and is intended to be
a "significant barrier to the litigation of insubstantial
claims," *id.* at 464. A defendant seeking "discovery on a
claim of selective prosecution must show *some evidence* of
both discriminatory effect and discriminatory intent." *United*
*States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam)
(emphasis added). Here, the district court correctly
articulated this governing test but erred in applying it.

To show discriminatory effect sufficient to warrant
discovery, a defendant must "produce some evidence that
similarly situated defendants . . . could have been
prosecuted, but were not." *Armstrong*, 517 U.S. at 469*; see*
*also id.* at 470 (describing the burden as "a credible showing
of different treatment of similarly situated persons"). As we
have explained,

> The goal of identifying a similarly situated
> class of law breakers is to isolate the factor
> allegedly     subject     to     impermissible

> discrimination. The similarly situated group
> is the control group. The control group and
> defendant are the same in all relevant
> respects, except that defendant was, for
> instance, exercising his first amendment
> rights. If all other things are equal, the
> prosecution of only those persons exercising
> their constitutional rights gives rise to an
> inference of discrimination. But where the
> comparison group has less in common with
> defendant, then factors other than the
> protected expression may very well play a
> part in the prosecution.

*United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989),
*superseded by statute as stated in United States v. Gonzalez-
Torres*, 309 F.3d 594, 599 (9th Cir. 2002); *see also United
States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000) (defining
a similarly situated person as "one who engaged in the same
type of conduct, which means that the comparator
committed the same basic crime in substantially the same
manner as the defendant—so that any prosecution of that
individual would have the same deterrence value and would
be related in the same way to the Government's enforcement
priorities and enforcement plan—and against whom the
evidence was as strong or stronger than that against the
defendant."); *cf. Bass*, 546 U.S. at 864 ("[R]aw statistics
regarding overall charges say nothing about charges brought
against *similarly situated defendants*.").

Defendants argued to the district court that they were
unconstitutionally prosecuted based on a policy of the
Trump Administration to prosecute an arbitrary class:
"'individuals associated with protests who the government

thought held anti-government views, regardless of what actual views they held.'" And they asserted that to evaluate the discriminatory effect of their prosecution, the district court should look to "a control group consisting of 'all individuals whom the [U.S. Attorney's Office] could charge federally for arson.'" The district court accepted the Defendants' posited control group "because both its members and defendants 'are the same in all relevant respects, except that' the charged offense—arson—allegedly occurred during the George Floyd Protests." The district court declined to consider the Government's narrower proposed control group—other arsons from the George Floyd protests—because individuals in that group also fell into Defendants' alleged arbitrary class.

Focusing on its selected control group—arsonists in the Central District of California—the district court turned to statistics. It noted that the U.S. Attorney's Office for the Central District brought four arson cases related to the George Floyd protests, two arson cases in the previous 10 years, and nine others in the decade before that. It also highlighted that the George Floyd protest cases were the first stand-alone arson charges brought since 2007. The district court further surveyed arson cases occurring in the area within the Central District overall, finding that between 2010 and 2019, an annual average of 3,500 arsons were reported and 559 were prosecuted. Based on these statistics, the district court found that the U.S. Attorney's Office was "obviously aware of and chose not to federally prosecute far more serious and damaging arsons" than the police-car burning for which Defendants were charged. As a result, it concluded that Defendants met their burden to show evidence of discriminatory effect.

This was an abuse of discretion because the district court "based its ruling on an erroneous view of the law." *Highmark Inc.*, 572 U.S. at 563 n.2 (citation omitted). In defining the control group with only two shared facts—(1) arson (2) within the Central District—the district court did not account for many other facets of the crimes. To be similarly situated means more than merely committing the same crime in the same place. *Aguilar*, 883 F.2d at 706; *Rundo*, 108 F.4th at 801. A proper comparator must be "the same [as the defendant] in all relevant respects." *Aguilar*, 883 F.2d at 706.

The required specificity of this comparison is illustrated by *United States v. Turner*, 104 F.3d 1180, 1184–85 (9th Cir. 1997), and *United States v. Steele*, 461 F.2d at 1151. In *Turner*, the defendants provided statistical evidence of racial disparities in crack-cocaine prosecutions. 104 F.3d at 1184. Nevertheless, we held that they failed to show unconstitutional selective prosecution based on race because the statistics did not account for other sociological factors, such as "the principal characteristic" of gang membership. *Id.* at 1185. And without accounting for all necessary factors, the defendants had "shown no more than the consequences of the investigation of violent street gangs," which is "a neutral, nonracial law enforcement decision." *Id.* By contrast, in *Steele*, the four defendants and the six-person control group all committed the same federal offense: refusal to complete the census questionnaire. 461 F.2d at 1151. But the defendants alone also took part in a census-resistance movement—holding press conferences, leading protest marches, distributing pamphlets, broadcasting editorials, and speaking out against the census on the radio—and the defendants alone were prosecuted. *Id*. In other words, the *only* distinguishing factor between the defendants and the

control group was constitutionally protected expression. We explained that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." *Id.* at 1152.

Here, Defendants did not offer evidence, and the district court did not make any findings, about the nature of the proposed comparators other than that they committed a shared crime in a shared location. There are no facts indicating, for example, which of the other arsons identified were eligible for federal prosecution or if the arsons involved government property, were committed by defendants with criminal records, were committed by defendants in connection with the expression of ideas, or were publicly touted by the defendants. Rather, the district court simply presumed, without evidence, that the comparator arsonists fell outside Defendants' defined arbitrary class of "'individuals associated with the protests who the government thought held anti-government views.'" This is insufficient to satisfy the "rigorous" standard that must be met before ordering the Government to produce selective-prosecution discovery. *Armstrong*, 517 U.S. at 468.

Following *Armstrong* and *Turner*, we resolve this case on the discriminatory-effect factor alone and decline to address whether Defendants presented evidence of discriminatory intent.[1] Because Defendants failed to meet

---

[1] The discriminatory-intent factor is quite muddled. As the Sixth Circuit has recognized, "the appellate courts . . . have had difficulty articulating a clear and uniform standard for what constitutes 'some evidence' of discriminatory intent." *United States v. Thorpe*, 471 F.3d 652, 660 (6th Cir. 2006).

their burden to produce some evidence that similarly situated
individuals could have been prosecuted but were not, we
reverse the district court's selective-prosecution discovery
order and its dismissal of the Defendants' indictment without
prejudice, and we remand for further proceedings consistent
with this opinion.

**REVERSED** and **REMANDED.**

---

BUMATAY, Circuit Judge, concurring:

When the government expressly targets arsonists,
terrorists, violent anarchists, and the like, it is not evidence
of discriminatory intent for a selective prosecution claim.
Instead, it's simply evidence of intent to enforce the law.
And the Constitution makes clear that the decision to
prioritize and prosecute certain crimes falls within the
discretion of the Executive Branch.   Absent "some
evidence" of discriminatory intent, federal courts have no
business meddling in the Executive's choice to enforce
criminal statutes. *See United States v. Bass*, 536 U.S. 862,
863 (2002) (per curiam).

And just because a prosecution follows political protests
makes no difference.   Indeed, violence is not immune from
prosecution merely because it is cloaked in political
ideology.   In other words, even if the Defendants here have
shown that the government selected them for prosecution
based on their "anti-government extremist" violence, that's
fine.   That's because those who engage in violence *for any
reason* are not a part of any protected class and the
government is free to bring down the hammer of the justice
system on them.   In dismissing the indictments of

Defendants Nathan Wilson and Christopher Beasley, the
district court far overstepped its boundaries.

\*      \*      \*

In this case, on May 31, 2020, the Defendants allegedly
set fire to a police car while protesting the death of George
Floyd.  The federal government indicted them both on one
count of arson.  The Defendants then sought to dismiss their
indictment on a selective prosecution claim: that the
government unconstitutionally singled them out because it
believed they held anti-government views.  The district court
granted discovery on this claim and later dismissed the
indictment after the government refused to comply with the
discovery order.  On appeal, we reverse.

While I join the majority opinion showing that the
district court botched the discriminatory-effect analysis, it's
worth explaining why the district court's discriminatory-
purpose analysis was also flawed.  *See United States v.
Armstrong*, 517 U.S. 456, 465, 468 (1996) (describing how
selective prosecution claims require both discriminatory
effect and discriminatory purpose).  The district court found
that the Defendants proved "some evidence" of
discriminatory intent because it concluded that the
government "may have identified, as 'anti-government
extremists,' individuals accused of engaging in criminal
activity during the George Floyd protests."  The district court
held that targeting violent lawbreakers with "anti-
government" views "qualifies as an arbitrary classification
within the meaning" of the Fifth Amendment Due Process
Clause.  But that's wrong.

First, the government does not engage in arbitrary
classifications when it singles out political violence for
prosecution.    Of course, prosecution "may not be

deliberately based upon an unjustifiable standard such as
race, religion, or other arbitrary classification, including the
exercise of protected statutory and constitutional rights."
*Wayte v. United States*, 470 U.S. 598, 608 (1985)
(simplified).    But targeting political violence is not
arbitrary—it's central to governance.    The federal
government has done so since the ratification of the
Constitution.  President Washington himself rode at the head
of an army to suppress the Whiskey Rebellion.  And federal
military officers helped to stamp out the Ku Klux Klan
during the early years of Reconstruction.    Indeed,
compelling evidence suggests that the Fourteenth
Amendment's Equal Protection Clause is an explicit
guarantee of federal protection against violence. *See* Randy
E. Barnett & Evan D. Bernick, The Original Meaning of the
Fourteenth Amendment: Its Letter and Spirit 334–35 (2021).

It defies common sense and constitutional history to say
that the Executive acts arbitrarily when it weeds out one of
the "great natural and historical enemies of all republics[:]
open violence." *See Ex parte Yarbrough*, 110 U.S. 651,
657–58 (1884).  No one can deny the government's interest
in combatting political violence. *Cf. Holder v.
Humanitarian Law Project*, 561 U.S. 1, 28 (2010)
("Everyone agrees that the Government's interest in
combating terrorism is an urgent objective of the highest
order.").  And it's also true that the government cannot
eradicate all political violence.  Thus, "[m]ere selectivity in
prosecution creates no constitutional problem." *United
States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972).
Selecting some violent extremists for prosecution doesn't
mean the government is acting with improper intent.  And,
of course, a government "investigation spurred by a high-
profile event," like the wave of violent protests in the

summer of 2020, "is not unconstitutional." *United States v. Rundo*, 108 F.4th 792, 808 (9th Cir. 2024); *see also Wayte*, 470 U.S. at 607 ("the Government's enforcement priorities . . . are not readily susceptible" to judicial review).

Second, while no one denies the central importance of free speech, the First Amendment doesn't alter the government's discretionary authority to target political violence. While political *speech* is no doubt protected, "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). While the government can't ban "nonverbal expressive activity . . . because of the ideas it expresses," it can ban such activity "because of the action it entails." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992). So while the Defendants may have attempted to express some heartfelt political belief by burning the police car, they are not free from prosecution simply because they committed arson "in order to 'protest' the law." *See Wayte*, 470 U.S. at 614. As the Court has said, "[t]he First Amendment confers no such immunity from prosecution." *Id.* After all, unlike protected expression, violence doesn't so much critique the government as cripple it.

And our decades-old decision in *Steele* doesn't prevent the government from targeting political violence for prosecution. True, we said that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas." *Steele*, 461 F.2d at 1152. But in that case, the government singled out the defendants—not for any political violence—but for engaging in protected expression, such as holding a press conference, leading a protest march, and distributing pamphlets. *Id.* at 1151. Based on that political

expression, the government charged them with the *separate* crime of refusing to answer census questions. *Id.* at 1150. Here, whatever political "expression" the Defendants engaged in was fundamentally violence—setting a police car ablaze to protest the death of George Floyd. So the government's "enforcement procedure" didn't target the "vocal offender," it targeted the "violent offender."

Third, the Defendants offered no evidence that the government prosecuted them for protected non-violent expression. Defendants cite several statements from President Trump and Attorney General William Barr. But these statements only communicated the intent to prosecute rioters for their violence—not for any political belief the government thought they expressed.

Take Attorney General Barr's Task Force Memorandum on Violent Anti-Government Extremists. It observed that "anti-government extremists" were "engaged in indefensible acts of violence" "[a]mid peaceful demonstrations protected by the First Amendment." *See* U.S. Dep't of Justice, "Memorandum Regarding Department of Justice Task Force on Violent Anti-Government Extremists" (June 26, 2020).[1] It then announced the creation of "a task force devoted to countering violent anti-government extremists" to help "prosecute violent acts by anti-government extremists." *Id.*

President Trump's statements similarly echoed the need to end political violence. On a call with State governors, President Trump stated that "what went on in Los Angeles with the stores . . . is terrible. Total domination, you have to dominate. . . . You've got to arrest these people and you've got to judge them . . . . These are terrorists . . . they're

---

[1] Available at https://bit.ly/Memo-task-force.

looking to do bad things to our country.  They're Antifa and
they're radical left."  CNN, "President Trump's Call with US
Governors Over Protests" (June 1, 2020).**2**    He then
described "what happened in Dallas where they kicked a guy
to death." *Id.*  According to President Trump, the purpose of
the prosecutions would be deterrence and retribution: "[if]
you don't do the prosecutions—they're just going to be
back. . . . [W]e have a couple people badly hurt and there's
no retribution, so you have to . . . use [our] legal system."
*Id.*  And he noted that this violence is "coming from the
radical left . . . but it's also looters." *Id.*  On the same call,
Attorney General Barr referred to the targets as "extremist
anarchist agitators" and noted that it would be imprudent to
"treat these as demonstrations" because then police would
not "have the dynamic ability to go out and arrest the
troublemakers*." Id*.

These statements show that the government sought
prosecution of the extremists *because* they had "engaged in
indefensible acts of violence."  Their repeated references to
violence are a call to enforce the laws—not target speech.
The mere fact that government officials also labeled those
who engaged in violence as "anti-government extremists,"
"Antifa," or "radical left" doesn't suggest that they targeted
the violent rioters because of their political beliefs.  *See
Rundo*, 108 F.4th at 806–07 ("Nothing in the press release
says that [the Rise Above Movement] was 'targeted'
*because* they were 'white supremacists'; instead, the words
'white supremacists' are only used to describe a statement of
fact: that [the Rise Above Movement] consists of them.").
In context, these officials used those labels to identify violent
wrongdoers, and these statements show that the decision to

---

2 Available at https://bit.ly/Trump-call.

prosecute those wrongdoers was based on their violence
alone.  Thus, the Defendants have not shown any evidence
that the government selected them "for prosecution on the
basis of their speech." *See Wayte*, 470 U.S. at 609.  With no
evidence of discriminatory intent, the district court was
wrong to order discovery and dismiss the indictment.

*        *        *

When the federal government targets perpetrators of
violence—no matter their political motivations—it acts
under its constitutionally derived authority.  Without
persuasive evidence that the government sought to suppress
non-violent political speech, courts have no business
meddling in the government's charging decisions.  I concur
in reversing the district court's discovery order and dismissal
of the indictment.

---

DONATO, District Judge, concurring.

I agree that we have appellate jurisdiction to review the
dismissal and discovery order.  I also agree that, on the facts
in the record before us, the District Court abused its
discretion in granting defendants Nathan Wilson and
Christopher Beasley's request for discovery and then
dismissing the indictment.  I write separately to state my
understanding of the standard a defendant must meet to be
entitled to discovery on a selective-prosecution claim.

There is no doubt that this claim "asks a court to exercise
judicial power over a 'special province' of the Executive."
*United States v. Armstrong*, 517 U.S. 456, 464 (1996)
(quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

It is also true that a prosecutor's discretion is not "unfettered." *United States v. Rundo*, 108 F.4th 792, 798 (9th Cir. 2024) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). "Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints," *Wayte*, 470 U.S. at 608 (omission in original) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)), including but not limited to the fundamental right against viewpoint discrimination under the First Amendment and the equal-protection guarantee of the Due Process Clause of the Fifth Amendment, *see Armstrong*, 517 U.S. at 464 (citing *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954)); *Rundo*, 108 F.4th at 801. A prosecutor may not charge a person based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)), "including the exercise of protected statutory and constitutional rights," *Wayte*, 470 U.S. at 608 (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).

The constitutional protections remain just as robust irrespective of whether the charged conduct involves violence, the destruction of property, or other mayhem. Perpetrators of violent conduct should be prosecuted, but the Constitution commands that prosecutors may not charge only those perpetrators whose race, religion, or political viewpoints are disfavored by the government.

To balance respect for the "special province" of a
coordinate branch with the safeguard that a prosecution not
be based on "an unjustifiable standard," the Supreme Court
of the United States has held that a defendant must present
"clear evidence" to establish that a prosecutor exceeded his
or her constitutionally permitted discretion. *Armstrong*, 517
U.S. at 464-65 (quotations omitted). The Court was also
clear that, although the standard for discovery is "rigorous,"
a defendant need not prove the defense first just to get
discovery. *Id.* at 468.

To that point, the Court recognized the consensus among
the federal courts that a defendant need only proffer "some
evidence tending to show" discriminatory effect and intent.
*Id.* (quoting *United States v. Berrios*, 501 F.2d 1207, 1211
(2d Cir. 1974)). The Court emphasized in *Armstrong* that
the "some evidence" standard is not without teeth and should
"be a significant barrier to the litigation of *insubstantial*
claims," *id*. (emphasis added), but *Armstrong* did not equate
the evidentiary burden for discovery with that of establishing
"a prima facie case of selective prosecution," *id.* at 467; *see
also United States v. Lewis*, 517 F.3d 20, 23 n.2 (1st Cir.
2008) ("[T]he quantum of evidence that would be needed to
authorize discovery is less than the quantum of evidence
needed to dismiss the indictment on selective prosecution
grounds." (citing *Armstrong*, 517 U.S. at 465, 468)); *United
States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003)
("The showing necessary to obtain discovery is somewhat
less.").

Consequently, we must take care to ensure that the
threshold a defendant must cross for obtaining discovery is
not so high as to foreclose a plausible selective-prosecution
claim before the merits are even examined. I do not read
*Armstrong* or any of our precedents to categorically define

or limit what a defendant may proffer as "some evidence tending to show" discriminatory effect and intent, or to hold that statistical evidence is never enough by itself to open the door to discovery. *Armstrong*, 517 U.S. at 468 (quotation omitted); *see United States v. Bass*, 536 U.S. 862, 863-64 (2002) (per curiam). Rather, "a district court should assess every material fact" in determining whether there are similarly situated offenders against whom the law has not been enforced. *Lewis*, 517 F.3d at 27.

With these principles in mind, I concur in the conclusion that defendants Wilson and Beasley fell short of crossing the threshold for discovery. Neither defendant produced evidence establishing a "colorable basis," *Armstrong*, 517 U.S. at 468, for concluding that similarly situated individuals were not prosecuted for arson because they did not engage in the public expression of certain political viewpoints. Consequently, on the specific record before the District Court, the discovery order was an abuse of discretion. On remand, I see no reason why defendants may not seek to renew a selective-prosecution discovery request and claim with proper evidence. In addition, I do not read our decision to establish, for these defendants or any others, a hard-and-fast checklist of evidence that a defendant needs to proffer to obtain discovery. We provide guidance on the types of evidence that might be germane, but nothing more.

I close by noting that neither *Armstrong* and our precedents, nor our decision today, preclude district courts from asking the government to provide "*some* response," short of document productions or evidentiary hearings, when the evidence before the court is "sufficiently disturbing." *Id.* at 477 (Stevens, J., dissenting) (emphasis added). In *Armstrong*, the government submitted affidavits from the prosecutor addressing defendant's selective-prosecution

theory and from law enforcement agents attesting that "race
played no role in their investigation." *Id.* at 459-60; *see also
Lewis*, 517 F.3d at 23 (government "submitted the affidavit
of an [investigative] agent who described the results of the
investigation"); *United States v. Turner*, 104 F.3d 1180,
1182-83 (9th Cir. 1997) (multiple affidavits submitted by
FBI agents and prosecutors stating basis of charges in
opposition to motion for discovery).

In this case, it is undisputed that the 2020 charges filed
against Wilson and Beasley were the first stand-alone
prosecutions for arson by the United States Attorney for the
Central District of California since 2007.   It is also
undisputed that defendants were prosecuted after the then-
President and Attorney General made public statements
blaming the violence at George Floyd protests on individuals
with leftist viewpoints such as antifa and anarchism,[1] and
threatening them with severe criminal penalties and long jail
sentences.  In these circumstances, the District Court could
reasonably request a word of explanation from the
prosecutors.

---

[1]  Antifa denotes "a loosely organized, secretive movement of like-
minded far-left activists." *Turner*, 108 F.4th at 798 n.3.  Attorney
General Barr expressly called out "anarchic and far-left extremist
groups" in connection with the George Floyd protests.  Phil McCausland,
*Attorney General Barr blames 'far-left extremist groups' for violent
protests*, NBC NEWS (May 30, 2020), https://www.nbcnews.
com/politics/justice-department/attorney-general-barr-blames-far-left-
extremist-groups-violent-protests-n1219696 (last visited Dec. 10, 2024).